1  JRG Attorneys at Law
2  Scott J. Allen (Bar No. 178925)
   Email: scott@sjallenlaw.com
3  Christopher R. McElwain (Bar No. 289132)
   Email: chris@knowmad.law
4  270 El Dorado Street
   Monterey, CA 93940
5  (831) 717-4995

6  Attorneys for Plaintiff,
7  PRIMUS GROUP, INC.

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  PRIMUS GROUP, INC.,                    )  Case No. 5:18-cv-00005-WHO
                                           )
11                      Plaintiff,         )  **PRIMUS MOTION FOR SUMMARY**
                                           )  **JUDGMENT OF INVALIDITY**
12  vs.                                    )
                                           )  Date:   July 10, 2019[1]
13  INSTITUTE FOR ENVIRONMENTAL            )  Time:   2:00 p.m.
     HEALTH, INC.,                         )  Place:  Courtroom 2
14                                         )  Judge:  Honorable William H. Orrick
15                      Defendant.         )
    _____   )
16  INSTITUTE FOR ENVIRONMENTAL            )
     HEALTH, INC.,                         )
17                                         )
18                      Counterclaimant,   )
    vs.                                    )
19                                         )
    PRIMUS GROUP, INC.,                    )
20                                         )
21                      Counter-defendant. )
                                           )
22  _____

23

24

25

26  _____

27  [1] On May 28, 2019, the parties filed a stipulation, subject to the Court's approval, to move the last day to hear dispositive motions one week, to July 17, 2019. This stipulation is currently under consideration by the Court. Dkt. 60.

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that at July 10, 2019[2] or as soon thereafter as counsel may be heard, Plaintiff and Counter-defendant Primus Group, Inc. ("Primus") will, and hereby does, move for summary judgment pursuant to Federal Rules of Civil Procedure 56 that all of the claims[3] of U.S. Patents 8,822,143 (the '143 Patent) and 9,637,771 (the '771 Patent) (collectively the "Patents-in-Suit" or the "Patents") owned by Defendant and Counterclaimant Institute for Environmental Health, Inc. ("IEH") are invalid as a matter of law.

This motion is supported by the following memorandum of points and authorities, the accompanying Declarations of Dr. Michael P. Doyle, Ph.D., the Declaration of Scott J. Allen, the Declaration of Robert Stovicek, the pleadings and other documents of record in this case, and such other arguments and evidence as may properly come before the court.

---

[2] On May 28, 2019, the parties filed a stipulation, subject to the Court's approval, to move the last day to hear dispositive motions one week, to July 17, 2019. This stipulation is currently under consideration by the Court. Dkt. 60. Should the stipulation be granted, Primus proposes that the hearing on the motion be held July 17, 2019.

[3] The '143 and '771 Patents are attached to the Declaration of Scott J. Allen (Allen Decl) Exhibits D and E, respectively. This motion seeks to invalidate claims 1-38 of the '143 Patent and claims 1-49 of the '771 Patent.

1

**TABLE OF CONTENTS**

2

NOTICE OF MOTION AND MOTION ................................................................................. 2

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I. Introduction ........................................................................................................................ 1

II. Background ......................................................................................................................... 1

   A.   The Patents .................................................................................................................... 1

   B.   The Prior Art Teaches Every Step of the Claimed Method ........................................ 2

      1.   Steps A and B: "Dry Compositing." ..................................................................... 2

      2.   Step C: Enrichment Of The Composited Samples Formed In Steps A and B ........... 3

      3.   Step D: Wet Compositing .................................................................................... 4

      4.   Step E: Testing Pooled and Individual Samples ................................................... 5

      5.   The Prior Art Taught A Combination Of Wet And Dry Compositing ..................... 6

III.   Re-Examination of the Parent Patent .......................................................................... 7

   A.   January 20, 2015 Decision: Patent Office Declares Parent Patent Obvious ............... 7

   B.   IEH Restricts Parent Patent to Meat, and PTAB Upholds The Meat-Only Claims. .... 8

   C.   Gombas—A Prior Art Reference Never Considered By The Patent Office—Teaches Post-Enrichment Pooling. ........................................................................................... 8

IV. Legal Standards ................................................................................................................. 9

V. Argument ......................................................................................................................... 10

   A.   The Claimed Method Is Obvious in View of a Combination of Davies (Or Siragusa) and Gombas. ........................................................................................................................ 10

      1.   Davies (or Siragusa) and Gombas Together Teach All Steps of the Claimed Method. 10

      2.   A POSITA Would Have Been Motivated to Combine Gombas and Siragusa, etc. ... 12

      3.   The Combination of Davies/Siragusa with Gombas Yields Predictable Results. ...... 13

      4.   This Combination Is a Predictable Variation Prompted by Market Forces ................ 14

   B.   IEH's Purported Evidence of Secondary Factors Do Not Show the Claimed Method is Non-Obvious. .............................................................................................................. 16

      1.   Lack Of Nexus to Any Novel Element of the Patents ............................................. 16

      2.   IEH's Purported Commercial Success Is Due to Factors Extraneous to the Patents . 17

         i.   The transition to pooled testing by IEH does not show a market preference for pooled testing. .......................................................................................................... 17

         ii.   Microbial Outbreaks Drove a Massive Increase in Demand for Food Testing Services in the Mid-2000's. ...................................................................................... 19

         iii.   Pooling wasn't new. ........................................................................................ 20

28

3.    The Need Addressed by Pooling Was Neither Long-Felt Nor Unsolved................... 21

4.    At Most, the Skepticism Reported by IEH's Employees Was Directed towards Unclaimed Embodiments of Its Method. ............................................................. 22

V. Conclusion ....................................................................................................................... 24

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

4
*ClassCo, Inc. v. Apple, Inc.*, 838 F. 3d 1214 (Fed. Cir. 2016)................................................... 22, 24

5

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966) ................................................ 9, 24

6

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336 (Fed.Cir. 2017)....... 24

7

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed.Cir.2004) ................................. 21

8

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563 (Fed. Cir. 1997) ...................... 17

9

*KSR Intern. Co. v. Teleflex Inc.*, 550 US 398 (2007)........................................................... 9, 11, 14

10

*Media Technologies Licensing, LLC v. Upper Deck Co.*, 596 F. 3d 1334 (Fed. Cir. 2010) .......... 9

11

*Muniauction, Inc. v. Thomson Corp.*, 532 F. 3d 1318 (Fed. Cir. 2008) ........................................ 9

12

*Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316 (Fed.Cir. 2017)................................... 16, 20

13

*Ormco Corp. v. Align Technology, Inc.*, 463 F. 3d 1299 (Fed Cir. 2006) ............................... 9, 21

14

*Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F. 3d 1324 (Fed. Cir. 2009)................... 21

15

*Sakraida v. Ag Pro, Inc.*, 425 US 273 (1976) ............................................................................. 24

16

*SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349 (Fed. Cir. 2000)..... 10

17

*Tokai Corp. v. Easton Enters.*, 632 F.3d 1358 (Fed.Cir. 2011) ................................................... 16

18

*United States v. Adams*, 383 U.S. 39 (1966)............................................................................... 22

19

*WBIP, LLC v. Kohler Co.*, 829 F. 3d 1317 (Fed. Cir. 2016). ...................................................... 22

20

21

**Statutes**

22

35 U.S.C. § 103(a) ...................................................................................................................... 10

23

Fed. R. Civ. P. 56(a) ..................................................................................................................... 9

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

The Patents-in-Suit claim a microbiological testing method composed entirely of techniques that were already known and well-understood in the field. In allowing the patents' parent survive a re-examination, the USPTO relied on a thin distinction between the method claimed and the prior art. To the extent this small gap was sufficient to render the parent patent's claims non-obvious, it is filled by the Gombas article discussed below, a reference that was never disclosed to or considered by the Patent Office. Every element of the claimed method is found in the prior art, copies of which are included with this motion and will be discussed further below. The particular way that these elements are arranged in the patents would have been obvious to a microbiologist of ordinary skill, since all of the known techniques of which the claimed method consists (sampling lots, compositing subsamples, enrichment, pooling, modular testing, etc.) perform exactly the same functions that they do in the prior art, yielding predictable results. Evidence that IEH contends shows that its pooled testing services have been commercially successful or addressed a long-felt need or were initially greeted with skepticism is unpersuasive on its face, lacks any nexus to what is actually claimed and novel in the patents, and, in any case, is insufficient to tip the scales of patentability given such a strong *prima facie* case of obviousness in light of the prior art's teachings.

### II. Background

#### A. The Patents

Both of the Patents-in-Suit are continuations of a common parent patent (U.S. Patent No. 7,534,584, hereafter the "'584 Patent" or the "Parent Patent") issued May 19, 2019. All stem from the same provisional patent application filed August 6, 2004. Allen Decl. Exs. D, E, and F

1    ("Related US Applications Data"). The Patents-in-Suit, like the Parent Patent, cover a method for

2    screening test "lots" for the presence or absence of microorganisms. The Patents organize the

3    claimed method into five steps, paraphrased below for clarity[4]:

4

5        **Step A:** Collecting multiple samples from each of multiple lots;

6        **Step B:** Combining the multiple samples from each lot together;

7        **Step C:** Separately enriching the combined samples from each lot, a step generally
         consisting of "adding a buffered media" (often a liquid broth) to the samples and then
8        incubating the broth at an appropriate temperature to promote growth of the targeted
         organism;
9

10       **Step D**: Removing a portion of each enrichment broth and "pooling" the portions; and

11       **Step E**: Analyzing the "pooled sample" for presence of the targeted organism "using an
         appropriate assay." If the assay result is negative, all of the samples that formed the pool
12       are considered negative. However, if the assay result is positive, the remaining portion of
         each enrichment broth is analyzed to determine which contains the targeted organism.
13

14     **B.  The Prior Art Teaches Every Step of the Claimed Method**

15   1.    Steps A and B: "Dry Compositing."
            For over forty years, microbiologists have combined test samples prior to analyzing them
16
     for microbial contamination. Declaration of Michael Doyle ("Doyle Decl.") Ex. A ¶ 20. One
17
     technique is simply to lump subsamples together to form a composite sample, a practice
18
     sometimes called "dry compositing," in contrast to "wet compositing," discussed below. Doyle
19
     Decl. Ex. J (Andrews reference) p. 360 (contrasting dry and wet compositing). Because multiple
20
     samples may need to be collected from a particular "test lot" in order to obtain a representative
21
22   sample, dry compositing can reduce the cost of testing a lot for the presence of a microbe.[5]

23

     _____

24   [4] Note that this paraphrasing roughly conforms to that provided by IEH's retained expert, Dr. Bruce Applegate. *See*
     Allen Decl. Ex. C pp. 6-7. The five steps listed here paraphrase the broadest of the independent claims, claim 1 of
25   the '143 Patent.  See, Allen Decl. Ex. D at claim 1. According to Primus' expert, Dr. Michael Doyle, the dependent
     claims of the Patents add relatively minor variations on this five step method; Declaration of Michael Doyle (Doyle
26   Decl.) Exhibit A at ¶ 9. None of the minor limitations added by the dependent claims fall outside the teachings of
     the prior art such that the dependent claims would be non-obvious.  Doyle Decl. Ex. A (Doyle Report Exs E and F).
27   [5] For example, a 1973 article by Silliker, et al. ("Silliker") noted that 60 individual 25-g subsamples should be tested
     before a food lot was considered negative for *Salmonella* but that "this recommendation would not be economically
28

     Case No. 5:18-cv-00005-WHO
     Primus Motion for Summary Judgment on Invalidity

Steps A and B merely claim this well-known technique of sampling test lots by collecting and compositing multiple subsamples from each lot. Dry compositing is taught in multiple prior art references. Doyle Decl. Ex. A ¶¶ 25, 30-32, 36-37, and 39-40. In one example, a 2003 article by Davies, et al. ("Davies"), the authors collected between 15-20 fecal samples from each of 20 separate lots (pig pens on 20 separate farms) and combined the multiple samples from each pen into a set of composite samples (one composite per lot).[6] Doyle Decl. Ex. C pp. 1017-1018 and Ex. A ¶¶ 35-37. By dry compositing, Davies was able to reduce the number of samples requiring analysis from over 5,000 to just 369 composites.  Doyle Decl. Ex. C pp. 1017-18.

Dry compositing is also taught in a 1993 article by Siragusa, et al. ("Siragusa") in which cattle were grouped into lots of 10 animals each, and composite samples formed by collecting one fecal sample from each individual animal. Doyle Decl. Ex. A ¶¶ 38-41 and Ex. F (copy of Siragusa) p. 102. It is also taught in the Silliker referenced discussed in note 3, *supra*[7] (Doyle Decl. Ex. A ¶¶ 26-34 and Ex. C) and in the Food and Drug Administration's BACTERIOLOGICAL ANALYTICAL MANUAL ("BAM") (Doyle Decl. Ex. A ¶¶ 24-25 and Ex. B (copy of BAM)).

2.  Step C: Enrichment Of The Composited Samples Formed In Steps A and B

Step C calls for "enrichment" of the dry composite samples formed in Steps A and B. Enrichment typically involves incubating samples in enrichment media (often a liquid broth) in

---

feasible on a routine basis." *Id.* Ex. C p. 476 and Ex. A ¶¶ 28-34. To address this dilemma, the authors studied several compositing techniques, concluding that *Salmonella* could be detected with "equal facility" in composite samples as individual samples. *Id.* Ex. C p. 478.

[6] Dr. Applegate, does not dispute Dr. Doyle's conclusion that Davies teaches all aspects of Steps A, B and C of the claimed patented method. Allen Dec. Ex. C pp. 15-16 and Ex. Q at 91:16-92:5 and 99:11-100:15.

[7] IEH's Dr. Applegate's claim that "Silliker only describes collecting one food sample (i.e., a 1,500-gram sample from the test lot), not multiple samples from multiple test lots" (Allen Decl. Ex. C pp. 13-14) is inconsistent with the plain text of the reference. Silliker clearly states that in "tests 22-26," the authors weighed out "180 25-g subsamples" from each lot and then formed 100-g samples by "randomly pooling four 25-g subsamples." Doyle Decl. Ex. A ¶¶ 26-27 and Ex. C p. 476. Randomly combining four 25-g samples from among a collection of 180 is clearly not "dividing a single 1,500-g sample into various subsamples" as Dr. Applegate suggests. *Compare* Allen Decl. Ex. C pp. 13-14 *and* Doyle Decl. Ex. C p. 476 and Table 1.

order to increase the numbers of the target microbe and facilitate detection. Sometimes the enrichment process is conducted in two parts – the first part, referred to as "pre-enrichment," is designed to allow injured bacteria to recover and start to multiply, and the second part, referred to as "secondary enrichment" or "selective enrichment" is then designed to allow bacteria to multiply to detectable levels. *See* Declaration of Michael Doyle ("Doyle Decl.") Ex. B ¶ 28 and n.2. The methods disclosed in Davies, Siragusa, Silliker, and BAM, for example, all teach enriching of composited test lot samples in a manner identical to Step C. *See*, Doyle Decl. Ex. A at ¶¶ 24-41; Exs. B-E.

3.    Step D: Wet Compositing

Step D calls for removing portions from each of the enrichment broths formed in Step C, and then combining the removed portions into a single container. The combined enrichment broths are referred to as a "wet composite" sample.

i.    Pre-Enrichment Wet Compositing

Wet compositing is far from a new technique. The approach is taught in the prior art stemming back to at least 1969, when the USDA published a comprehensive study on *Salmonella* that included a section titled *"Wet Compositing" as an Approach to Control Procedures for the Detection of Salmonellae* ("USDA"). Doyle Decl. Ex. K (copy of USDA) pp. 206-207. Similarly, a 1972 article by Price, et al. ("Price") examined the efficacy of testing wet composite samples by combining portions of multiple enrichment media. Doyle Decl. Ex. A ¶¶ 42-46 and Ex. F. Both USDA and Price involve the wet compositing at the "pre-enrichment" stage – that is, after the first of a two-step enrichment process. In USDA and Price, the wet composite is further incubated (that is, further enriched) prior to analysis.

ii. Post-Enrichment Wet Pooling

In April of 2003 (more than a year before IEH submitted its original patent application), an article published by Gombas et al ("Gombas") taught the use of wet compositing AFTER the completion of the enrichment process.  Gombas thus teaches "post-enrichment wet compositing," in contrast to the pre-enrichment wet compositing taught 30 years earlier by USDA and Price  Doyle Decl. Ex. A ¶¶ 52-55 and Ex. G. In the Gombas study, samples of salads and deli meats collected in grocery stores were enriched in a broth designed to encourage growth of *Listeria*.[8] *Id.* Ex. G p. 563. After the enrichment process was completed, 1-ml extracts of five separate broths were combined into a single wet composite, which was tested for the presence of Listerial using a DNA-based detection assay. *Id.* p. 564. IEH's retained expert, Dr. Applegate, concedes that Gombas teaches post-enrichment wet compositing. Allen Decl. Ex. Q at 134:8-9 (". . . samples were enriched prior to compositing.").

4. Step E: Testing Pooled and Individual Samples

Step E calls for testing of the wet composite using a suitable detection assay; if the wet composite tests negative for the target microbe, all of the samples that contributed to the wet composite are considered negative and not tested further; but, if the wet composite tests positive, the individual samples that contributed to the wet composite are then tested individually to determine which sample caused the positive detection.  Any individual sample that is found to be positive treated as positive and any individual sample that tests negative is considered negative.

Step E is taught in the prior art, namely in both Price and Gombas.  In 1972, Price noted the advantage of wet compositing as follows: "The pooling of broth cultures permits small

---

[8] An identical medium—UVM-2 broth—was used in the Siragusa method and explicitly described as a "selective broth." Doyle Decl. Ex. D at 105. Dr. Applegate concedes that Gombas teaches an enrichment step as claimed in Step C. Allen Decl. Ex. Q at 161:4-10.

portions of each individual culture to be retained for subsequent analysis if a positive test is detected following enrichment, thus maintaining the individuality of each test sample." Doyle Decl. Ex. F pp. 679 and 681. Thus, in the Price study, just like Step E of the patents, whenever a wet composite tested positive, the individual samples were then tested. This same function is evident in Gombas, which simply applied the approach of Price to post-enrichment wet compositing. In Gombas, whenever the post-enrichment composite tested negative for *Listeria*, the authors deemed all five individual samples that made up the composite to be negative; whenever a wet composite tested positive, however, the authors tested the five samples individually to determine which one(s) contributed to the positive result. Doyle Decl. Ex. G p. 564. Price Figure 1 and Gombas Figure 1 (left and right below, respectively) both illustrate this modular testing technique, which allows microbiologists to pinpoint the source of contamination, while still benefitting from the reduced laboratory workload provided by pooling samples.



5.   The Prior Art Taught A Combination Of Wet And Dry Compositing

The discussion above has focused on showing that each of the individual steps of the patented claims were known in the prior art.  Primus does not intend to give the impression that the prior art taught the individual steps in isolation, with no indication that the steps be combined

into a single method.  In fact, just the opposite is true.  Several references stemming back to at least the early 1970's explicitly teach a *combination* of dry compositing, enrichment, wet compositing, and analysis in a single method as a means of reducing laboratory workload.

For example, in a 1973 article, Silliker teaches just such a combination.  Silliker began by collecting 60 separate samples from each of five separate lots of dried foods (one lot of chocolate almonds, two lots of dried coconut, and two lots of fish meal). Silliker dry composited the 60 samples from each lot in groups of 4 to form a set of 15 composites from each lot.  After pre-enrichment, Silliker then combined 1-ml extracts from five samples, to form a set of just 3 wet composite samples requiring laboratory analysis.  Doyle Decl. Ex. A ¶¶ 28-34 and Ex. C p. 475. In a 1989 textbook by Basil Jarvis ("Jarvis") explicitly recommends (1) dry compositing, (2) wet compositing, and/or (3) a *combination of both* as a means of reducing the number of samples requiring laboratory analysis. Doyle Decl. Ex. A ¶¶ 47-51 and Ex. H p. 141.

### III.   Re-Examination of the Parent Patent

A.   <u>January 20, 2015 Decision: Patent Office Declares Parent Patent Obvious</u>

As mentioned above, the Patents-in-Suit are both continuations of a common Parent Patent.  Shortly after it was issued, the Parent Patent was challenged in an *inter partes* reexamination proceeding. On January 20, 2015, the Patent Trial and Appeals Board (PTAB) declared all of the claims of the Parent Patent to be obvious and thus invalid. [9] Allen Decl. Ex. G. The PTAB found that the differences between the claimed method and the prior art were slight and would have been obvious to a person of ordinary skill in the art. *Id.* pp. 12-19. The PTAB also found that IEH's proffered evidence of "secondary considerations" such as commercial success and skepticism were insufficient to overcome this *prima facie* case of obviousness and,

---

[9] The scope of the claims of the Parent Patent declared invalid by the PTAB are largely identical the claims of the Patents-in-Suit. *See* Allen Decl. Ex. G pp. 5-6.

in any event, had no nexus to the claims, as all the evidence related specifically use of pooled testing in the beef industry, a limitation not present in the Parent Patent's claims in 2015 when the PTAB first considered the Parent Patent. *Id.* at 23-25.

B.   IEH Restricts Parent Patent to Meat, and PTAB Upholds The Meat-Only Claims.

Rather than appeal invalidation of its claims, IEH chose to reopen prosecution of the Parent Patent. Allen Decl. Ex. H p.2. IEH amended the claims, restricting the scope of the Parent Patent to a method for sampling and testing beef and other meats. *Id.; see also* Allen Decl. Ex. J.

The PTAB subsequently upheld the validity of the newly limited, ***meat-only*** claims of the Parent Patent. Allen Decl. Ex. H pp. 2-3 and Ex. I p. 2. In two subsequent decisions, the PTAB found that the claimed method differed from the prior art only in that prior art taught pre-enrichment wet compositing while the patent claimed post-enrichment compositing. Allen Dec. Exs. H pp. 6-9, I pp. 14-15. With that minor distinction from the prior art, together with IEH's proffered secondary evidence related to its beef-industry activities, the PTAB upheld the meat only claims.[10]  Allen Decl. Ex. I at 14-15.

C.   Gombas—A Prior Art Reference Never Considered By The Patent Office—Teaches Post-Enrichment Pooling.

The PTAB's analysis of the Parent Patent during reexamination is important because, here, Primus relies on prior art that was not considered by the PTAB. Gombas explicitly teaches post-enrichment pooling, filling in the slender gap relied upon by the PTAB in allowing the narrowed meat-only claims of the Parent Patent to escape re-examination.

---

[10] In contrast, the claims of the Patents-in-Suit are NOT limited to testing meat, and Primus's business does not extend to the meat production industry. The only time that the PTAB addressed equivalent, unrestricted claims (*i.e.* NOT limited to testing meat) was in its January 20, 2015 decision finding those claims obvious. Allen Decl. Ex. G.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV. Legal Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Whether an invention would have been obvious at the time the invention was made is a question of law […]." *Media Technologies Licensing, LLC v. Upper Deck Co*., 596 F. 3d 1334, 1337 (Fed. Cir. 2010). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR Intern. Co. v. Teleflex Inc.,* 550 US 398, 427 (2007).

Under 35 U.S.C. § 103(a), a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." In analyzing obviousness, a court must first determine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966). "Against this background, the obviousness or nonobviousness of the subject matter is determined." *Id.* Where "secondary considerations" such as commercial success might shed light on any of these questions, courts also take evidence of such into account. *Id.* at 406 and 415. Although the probative value of secondary considerations is fact-dependent and highly situational, courts routinely resolve the weight accorded to this factor as a matter of law. *See, Ormco Corp. v. Align Technology, Inc.*, 463 F. 3d 1299 (Fed Cir. 2006) (reversing district court's denial of motion for summary judgment of invalidity); *Muniauction, Inc. v. Thomson Corp.*, 532

F. 3d 1318 (Fed. Cir. 2008) (reversing district court's denial of defendant's motion for judgment as matter of law and vacating jury finding of non-obviousness).

Although the challenger (here, Primus) bears the burden of demonstrating that an issued patent is invalid by clear and convincing evidence, this burden is more easily met where a court is presented with prior art that was never submitted to or considered by the Patent Office, as is the case with the Gombas and Siragusa references discussed below. *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000).

## V. Argument

### A. The Claimed Method Is Obvious in View of a Combination of Davies (Or Siragusa) and Gombas.

1. <u>Davies (or Siragusa) and Gombas Together Teach All Steps of the Claimed Method.</u>

As noted above, the prior art teaches each and every step of the claimed method, and several of the prior art reference teach a combination of multiple steps. For example, the evidence in this case is ***undisputed*** that Davies teaches three out of the five steps in the claimed method. Specifically, Primus' expert, Dr. Doyle, opines that Davies teaches all aspects of Steps A (collecting multiple samples from multiple lots), B (dry compositing) and C (enrichment of the dry composites). Doyle Decl. Ex. A ¶ 37. IEH's retained expert, Dr. Applegate does not dispute Dr. Doyle's conclusion regarding Davies teachings on steps A, B and C. Allen Decl. Ex. C at pp. 15-16; Allen Decl. Ex. Q (Applegate Deposition) at 91:16-92:5 and 99:11-100:15.

Meanwhile, Gombas, as discussed above, teaches both Steps D (post-enrichment wet compositing) and E (analysis of samples). Thus, in combination, Davies (steps A, B and C) and Gombas (steps D and E) teach all five of the claimed steps. *See*, Doyle Decl. Ex. A ¶ 69 (illustrating combination of Davies and Gombas).

1   Dr. Doyle also opines that the 1993 reference Siragusa discloses every aspect of Steps A,

2   B and C (Doyle Decl. Ex. A at ¶¶ 38-41, Ex. D at 102-103), a conclusion not seriously disputed

3   by IEH's Dr. Applegate.[11]   Thus, combining Gombas with Siragusa yields every step of the

4   claimed method, as illustrated below:

5

6   **Step A**
    "collecting multiple independent
7   samples from each of multiple separate
    lots" per Siragusa

8   **Step B**
    making "composited lot samples" per
9   Siragusa

10  **Step C**
    enriching samples per Siragusa and
11  Gombas

12  **Step D**
    combining a portion of each enriched
    lot sample to make a pooled sample per
13  Gombas

14  **Step E**
    testing the pooled sample per Gombas:
15  when negative, all lots deemed
    negative; when positive, lot samples
16  tested individually to identify positive
    lots; individual tests that are negative
    treated as negative, not tested further



17  Such a combination would not require uniting knowledge from far-flung fields. Indeed, the

18  methods used in Siragusa and Gombas were both designed to detect the same microbe (*Listeria*),

19  using the same assay (Gene-Trak), in samples enriched in the same enrichment medium (UVM-2

20  broth). Doyle Decl. Ex. A ¶ 70.

21

22

23

24

25  _____

26  [11] In an attempt to claim that Siragusa does not teach Step A, Applegate makes the patently absurd argument that
    Siragusa's act of collecting independent fecal samples from 10 separate individual cattle in a pen is somehow not
    "independent" or "non-contiguous" sampling.  Allen Decl. Ex. C pp. 18-19.  Given that Siragusa collected the
27  samples by separately catching each animal in a chute and taking the sample with a separate glove, Doyle Decl. Ex.
    D at 102, Applegate's suggestion that the samples were not "independent" or "non-contiguous" is easily dismissed.

28

2.      A POSITA Would Have Been Motivated to Combine Gombas and Siragusa, etc.

A claim that combines "familiar elements according to known methods" or substitutes "one element for another known in the field" is likely obvious unless it does "more than yield predictable results." *KSR,* 550 U.S. at 416.

Obviousness is determined from the point of view of a "person of ordinary skill in the art" (POSITA) at the time an invention was made. A POSITA is assumed not only to have knowledge typical of their field but also to be able to make "inferences and creative steps" allowing them to fit multiple pieces of prior art "together like pieces of a puzzle." *Id.* at 420. Here, the pertinent art is microbiology, and a POSITA would likely have at least a bachelor's degree in the field and either an advanced degree or equivalent professional experience.[12] Doyle Decl. Ex. A ¶ 18. Such a person would be familiar with a variety of sampling, enrichment, and testing techniques, including the pooling technique discussed in Gombas (*i.e.* Steps C, D, and E) and the sampling technique discussed in, *e.g.*, Davies and Siragusa (*i.e.* Steps A, B, and C). *Id.*

To the extent not already obvious, the prior art supplied ample motivation to combine the dry compositing sampling schemes of prior art such as Siragusa (or Davies) with post-enrichment wet compositing as taught by Gombas.  Indeed, prior art such as Silliker and Jarvis explicitly teach such a combination.[13] Doyle Decl. Ex. A ¶¶ 33 and 74. The benefit of doing so is

---

[12] Dr. Applegate argues that a lower skill level is typical in microbiology, as "many workers in this field lack a bachelor's degree" and might be expected to have as little as one year of experience. Allen Decl. Ex. C at pp. 9-10. He concedes that such workers "do not develop microbiological testing methods" but argues that they are still capable of "understanding and implementing" such methods. *Id.* A POSITA must be capable of more than simply following instructions; they must be able to apply the teachings of the prior art in a field to solve a given problem. For example, in *KSR,* a POSITA in automotive systems was presumed to be an engineer, not a mechanic. *KSR,* 550 U.S. at 412. In any case, it is likely that even an inexperienced lab technician of the sort Dr. Applegate envisions would understand that samples could be collected, composited, and enriched like in Davies and then pooled and tested like in Gombas.

[13] In his 1989 book, Jarvis explained that a combination of dry compositing and wet compositing "is sometimes recommended . . . in order to reduce the work load of the laboratory."  Doyle Decl. Ex. H at 141.

plain. By dry compositing 60 samples in groups of 4, Silliker reduced the number of tests required from 60 to 15; by adding a wet compositing step, Silliker further reduced the number of tests requiring laboratory analysis from 15 to just 3. Doyle Decl. Ex. A ¶ 27; Ex. C at Table 1. Likewise, in Davies, by dry compositing approximately 15 fecal samples from each pig pen, the authors reduced the total number of samples to be analyzed from over 5,000 to just 369. Doyle Decl. Ex. A ¶ 35 and Ex. E.  By combining Davies' sampling approach with Gombas's teaching on wet compositing in pools of 5, a POSITA would have understood that the number of tests could be further reduced to just 74.

Moreover, from both the 1972 teachings of Price and Gombas in 2003, a POSITA would further understand that the advantages of using wet compositing include the ability to identify which sample was responsible for a positive detection. *See*, section II.B.4 above. In short, a POSITA had ample explicit teaching and motivation to combine the teachings of prior art such as Davies (or Siragusa) with the post-enrichment wet compositing teachings of Gombas.

3.    The Combination of Davies/Siragusa with Gombas Yields Predictable Results.

All the steps of the claimed method perform exactly the same functions that they do in the prior art. As explicitly discussed in the prior art, the advantage of wet compositing as claimed in Steps C, D, and E is to reduce laboratory costs and workload while still allowing individual positive test samples to be identified.

The prior art also teaches that wet compositing is particularly useful when testing large numbers of samples likely to have a low prevalence of the target microbe. Price noted that "[p]ositive test results are relatively rare among the many samples of food ingredients and products which are analyzed for *Salmonella*. Therefore, a test procedure that gives a single negative answer for many negative samples offers an important saving in the analytical effort

required for quality control." Doyle Decl. Ex. F p. 679 and Ex. A ¶¶ 42-46. Price concluded that pooling accomplished this goal, while still allowing the source of contamination to be pinpointed by re-testing individual samples in the manner of Step E. *Id.* Ex. F p. 680 and Figure 1 and Ex. A ¶¶ 42-44.

Meanwhile, the purpose of collecting a dry composite sample from a test lot per Steps A and B was also established in the prior art. For example, the standard method of food sampling recommended in BAM calls for collecting multiple 25-g subsamples from "a wide variety of locations" around a food lot but notes that these samples "may be combined into 375 g composites." Doyle Decl. Ex. B p. 3 and Ex. A ¶¶ 24-25. BAM also explicitly teaches the motivation for compositing multiple samples from non-contiguous locations: if samples "are not representative of the sampled lot, the laboratory results will be meaningless." *Id.* Ex. B p. 1. Steps A and B function the same way in the context of the claimed method. *Id.* Ex. A ¶ 72.

The Patents' combination of Steps A-C with Steps D-E simply represents application of a known sampling technique to the prior-art pooling method of Gombas (Doyle Decl. Ex. A ¶ 66) or, conversely, application of the known pooling technique disclosed in Gombas to the prior-art method of sampling test lots by dry compositing multiple samples discussed in references like Davies (Doyle Decl. Ex. A ¶ 72).

4.    This Combination Is a Predictable Variation Prompted by Market Forces

"When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *KSR,* 550 U.S. at 417. Combining the pre-enrichment dry compositing technique claimed in Steps A-C with the

post-enrichment wet compositing technique claimed in Steps C-E was an obvious response to market demand to more cost-efficiently process greater numbers of test samples.

Just prior to and shortly after the Patents' priority date, several well-publicized microbial outbreaks in the food supply led to a precipitous increase in product sampling and testing. For example, Dr. Mohammad Koohmaraie, CEO of IEH's meat division described the 1993 "Jack-in-the-Box" incident, in which hundreds were sickened and multiple children died due to contaminated beef, as "The Meat Industry's 9-11" and "a seminal point ... for our country." Allen Decl. Ex. B at 14:25-15:11 and Exhibit A, p. 17. The Jack-in-the-Box event created commercial and regulatory pressure on the beef industry to test 100% of its product, a policy ultimately adopted towards the end of 2002. *See* Allen Decl. Ex. A at 123:8-20 and Exhibit U. According to Dr. Koohmaraie, this policy appeared effective until "a spike in outbreaks and recalls beginning in 2007." Allen Decl. Ex. B at 38:14-17 and Exhibit A, p. 17; *see also* 41:5-8 and 41:16-23. One response to this sudden spike was to "increase the resolution" of testing by sampling a single 2,000-lb "combo" of beef trim rather than five combos, as had previously been the standard, effectively quintupling the number of samples needing to be tested. *Id.* at 44:10-22 and Deposition Exhibit A, p. 19 ("Single combo testing emerges."). By August 12, 2008, this change to single-combo testing was officially endorsed by the USDA Food Safety and Inspection Service (FSIS). Allen Dec. Ex K p. 15.

Meanwhile, a 2006 outbreak of *E. Coli* traced to bagged spinach produced by Earthbound Farms prompted similar changes in the fresh produce industry. Doyle Decl. Ex. A ¶¶ 85-92; Stovicek Decl. ¶¶ 7-13. Dr. Applegate waves away the significance of this event. Allen Decl. Ex. C p. 51. However, as described by Dr. Mansour Samadpour, IEH's founder, President and CEO, the spinach outbreak killed 5 people and sickened 200 across 26 states. Allen Decl. Ex. A at

39:4-40:8. Like the Jack-in-the-Box event, the 2006 spinach outbreak dramatically changed the market for food safety testing. Doyle Decl. Ex. A ¶¶ 85-92; Stovicek Decl. ¶¶ 7-13.

Dr. Applegate suggests that the "invention" of pooling was what caused food producers to increase their testing efforts during this period. Allen Decl. Ex. C at 8. However, the causation was almost certainly the other way around. Doyle Decl. Ex. A ¶ 92. Regulatory and commercial pressure on food producers to screen more product created a market incentive to use pooling, a technique known to mitigate the costs of processing large numbers of test samples. Doyle Decl. Ex. A ¶ 87. A POSITA faced with such market forces would have had ample reason to believe that this known technique was a good fit for the new commercial paradigm, given the prior art's teachings that sample pooling is particularly cost-efficient for detecting "low prevalence" contamination of the type faced by food producers. Doyle Decl. Ex. I p. 195 and Ex. A ¶ 73.

**B.      IEH's Purported Evidence of Secondary Factors Do Not Show the Claimed Method is Non-Obvious.**

1.      Lack Of Nexus to Any Novel Element of the Patents

IEH will likely argue that evidence of certain "secondary considerations" (aka "objective indicia") such as commercial success, copying, skepticism, and a long-felt unsatisfied need, demonstrate that its claimed method was non-obvious. For secondary evidence to be accorded substantial weight, a "nexus must exist 'between the evidence and the merits of the claimed invention.'" *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2017). It must appear that the secondary indicia arise from "what is both claimed and ***novel*** in the claim." *Id.* (emphasis added). If, for example, purported commercial success or skepticism or other indicia relate to an element that was known in the prior art, there can be no nexus. *Id.*; *see also, WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1331 (Fed.Cir. 2018), cert. denied 139 S.Ct. 1216 ("commercial success" requires a showing "that the driving force behind the

product sales was a direct result of the **unique characteristics** of the claimed inventions")(emphasis added); *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1369 (Fed.Cir. 2011)("If commercial success is due to an element in the prior art, no nexus exists.").

2.   IEH's Purported Commercial Success Is Due to Factors Extraneous to the Patents

Where commercial success, however great, is due to factors "extraneous to the patented invention, such as advertising or superior workmanship," it cannot serve as evidence of non-obviousness. *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). Moreover, the "driving force" behind the commercial success must be the "unique characteristics" of the claimed invention. *WesternGeco*, 889 F.3d at 1331. Here, IEH will most likely argue that its sales of pooled testing services are proof that pooling was non-obvious, despite the apparent teachings of the prior art. However, the undisputed evidence, including testimony from IEH's own executives, demonstrates that these sales were primarily driven by various factors extraneous to the Patents.

    i.   The transition to pooled testing by IEH does not show a market preference for pooled testing.

IEH will likely alleges that between 2008 and 2018, its sales of pooled testing services covered by the patents have increased from about ████████████████████████████, demonstrating that the claimed method has been commercially successful and thus non-obvious. *See*, e.g., Allen Decl. Ex. C pp. 43-44. The undisputed evidence, however, reveals that IEH's transition from non-pooled testing to pooled testing was driven primarily by a corporate decision **by IEH**. ████████████████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████████



And there are many reasons independent of the claimed method that customers use IEH to test their products. According to Dr. Koohmaraie,

Dr Koohmaraie also testified about other factors, extraneous to the Patents, that cause customers to choose IEH over other laboratories: for example,

[REDACTED]

[REDACTED]

ii.   Microbial Outbreaks Drove a Massive Increase in Demand for Food Testing Services in the Mid-2000's.

As already mentioned above, during the time period of IEH's purported commercial success, enormous changes in food safety testing occurred in the wake of several pathogen outbreaks, including a 2007 "spike" in beef outbreaks and a 2006 outbreak of *E. Coli* that was ultimately linked to bagged spinach grown on a farm in Central California. The impact of this crisis on Primus's business is apparent in the following chart showing the number of samples (pooled, non-pooled, and both) analyzed by Primus each quarter between 1998 and 2018:



Stovicek Decl. Ex. A. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[15] IEH asserts that Primus "directly copied IEH's methods" in its introduction of pooled testing services. Allen Decl. Ex. C at 46. Primus disputes that it learned of pooling from IEH. The document that supposedly revealed IEH's

The spinach outbreak also profoundly changed IEH's business. According to IEH

founder and CEO, Dr. Samadpour, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

### iii.    Pooling wasn't new.

In the end, the foremost problem with IEH's suggestion of a nexus between commercial

success and something novel in its method lies in the fact that *there was nothing novel about*

*wet compositing test samples by the time IEH commercialized its method*. Further, the principal

benefit of wet compositing —namely, reducing laboratory costs while still enabling individual

positive samples to be identified—was well understood and disclosed by the prior art. Therefore,

even if IEH could demonstrate that it was the first to successfully market this known technique,

---

proprietary methods to Primus contained a single vague reference to pooling: "Dispense an equal volume from each
of the samples into the appropriate composite aliquots and label them with corresponding sample IDs for each
group." Primus001598. In 2007, long before one of its clients sent it a copy of IEH's protocol document, Primus had
considered pooled testing in the context of exploring adoption of the Pathatrix assay, a third-party system that
incorporated pooling. Allen Decl. Ex. L at 15:7-12; 17:1-22:4; and 23:9-14. By the time it decided to adopt pooled
testing in 2010, it considered IEH's method just a "basic pooling concept." *Id.* at 23:13-14. In any event, with
respect to the ultimate question of whether the claimed method was obvious, it is irrelevant *how* Primus came to
adopt pooled testing services. What matters is *why*, and the answer to that is clearly that Primus was responding to
evolving demand in the market for produce testing.

1 | such evidence has no bearing on the question of obviousness. *See Novaratis AG v. Torrent*

2 | *Pharmaceuticals Ltd.*, 853 F. 3d 1316, 1330-1331 (Fed. Cir. 2017) (there can be no nexus

3 | between commercial success and a product feature known in the prior art, even if that feature is

4 | previously "not available to the market").

5 |

6 | 3.   The Need Addressed by Pooling Was Neither Long-Felt Nor Unsolved.

7 |      IEH may also argue that its claimed method addressed a long-felt but unresolved need in

8 | the food testing industry. For example, Dr. Applegate's report posits in very general terms that,

9 | because outbreaks of pathogens in food have been a historic problem, there has long been a need

10 | for any invention that might improve food safety in some way. Allen Decl. Ex. C pp. 35-39.

11 |      However, IEH has produced no evidence whatsoever of long-felt need specifically for the

12 | claimed method, much less any evidence of "how long this need was felt, or when the problem

13 | first arose." *See Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F. 3d 1324, 1332 (Fed. Cir.

14 | 2009). Absent a showing of need specifically for the inventive aspect of the patent, "the mere

15 | passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip*

16 | *Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed.Cir.2004). Dr. Applegate's discussion

17 | of the history of food safety research makes no mention of any long-felt need for pooling in

18 | particular and provides no indication that attempts by others to make food safer were thwarted

19 | because they didn't know how to combine dry compositing and wet compositing. There is thus

20 | no nexus to any novel feature of the patent. *See, Ormco Corp. v. Align Tech., Inc.*, 463 F.3d

21 | 1299, 1313 (Fed. Cir. 2006) (disregarding long-felt need where "the evidence does not suggest

22 | that these prior attempts failed because the devices lacked the claimed [inventive] features.").

23 |      As was well-recognized in the prior art, pooling samples reduces laboratory costs and

24 | workload. The implication of Dr. Applegate's argument is that improvements in food safety had

1   been held back for a century by the insurmountable expense of analyzing five individual test

2   samples rather than one pooled sample, and that the marginal cost savings of IEH's "invention"

3   unleashed the food industry's pent-up desire for more burdensome sampling and testing

4   standards. However, there is no evidence for this improbable bottleneck. To the contrary, the

5   evidence indicates that the demand for sampling and analyzing larger product volumes arose just

6

7   prior to IEH's commercialization of the claimed method.

8

9

10

11

12

13

14

15

16   4.   <u>At Most, the Skepticism Reported by IEH's Employees Was Directed towards Unclaimed Embodiments of Its Method.</u>

17

18       Where there is evidence that "experts expressed disbelief" that an invention achieves its

19   claimed result, that can weigh in favor of non-obviousness. *United States v. Adams*, 383 U.S. 39,

20   52, (1966); *see also WBIP, LLC v. Kohler Co.,* 829 F. 3d 1317, 1335 (Fed. Cir. 2016). However,

21   like all secondary consideration evidence, this skepticism must be "reasonably commensurate

22   with the scope of the claims." *ClassCo, Inc. v. Apple, Inc*., 838 F. 3d 1214, 1220 (Fed. Cir. 2016)

23       Here, IEH has asserted that its claimed method was met with "industry skepticism." *See*

24   Allen Decl. Ex. C pp. 40-43. Dr. Applegate learned of this skepticism during interviews with

25   IEH's officers and employees and upon reviewing declarations they submitted in connection

26   with the Parent Patent's reexamination. *Id.* IEH's employees reported the following: (1) Dr.

27

28

1   Koohmaraie remembered wanting to "see evidence the method actually worked" (*id.* at p. 40);

2   (2) former-employee Warren Mirtsching testified that he had been initially "concerned that Dr.

3   Samadpour's approach would not give the accuracy of testing to reach a sensitivity to identify the

4   pathogen, due to a 'dilution effect'." (*id.* at p. 41 and Allen Decl. Ex. M ¶ 5); (3) IEH employees

5   had witnessed a variety of third parties say various things that they interpreted as expressing

6   skepticism (Allen Decl. Ex. C pp. 40-42); (4) Dr. Samadpour had difficulty obtaining a "Letter

7   of Objection" from FSIS in 2008 (*id.* pp. 42-43); and (5) government regulators expressed

8   concerns with pooling, allegedly evident in a 2006 response by one of IEH's clients to a FSIS

9   notice, as well as in the 2008 draft guidelines by FSIS for *E. Coli* beef testing and 1999 FDA

10  guidelines concerning sprouts testing (*id.* p. 43; Allen Decl. Exs. K, N, and O).

11       The most fundamental problem with IEH's evidence of skepticism is that it is not

12  remotely commensurate with the scope of the Patents' claims. Even if IEH could show that

13  someone believed that pooling samples was contraindicated for a particular situation, this does

14  nothing to show that the method was non-obvious, as the Patents' claims extend to testing for

15  *any* microbe, in test lots of *any* nature and size, for *any* purpose, using *any* enrichment method

16  and *any* test assay. At best, therefore, the skepticism that IEH asserts is directed towards specific

17  unclaimed embodiments rather than towards the claimed method *per se*.

18       Moreover, there is no nexus between this alleged skepticism and any novel feature of the

19  Patents because, again, pooling wasn't new. The post-enrichment samples pooled in the Gombas

20  study would seemingly be subject to this same "danger of creating false negatives" that IEH

21  contends raised such consternation. To the extent anyone expressed doubt that this known

22  technique would perform according to its demonstrated prior-art function, such expressions do

23  not weigh in favor of non-obviousness.

In any event, IEH's evidence of skepticism is thin at best. The only firsthand expression of skepticism in the record appears to be the 2011 declaration of Warren Mirtsching, who was employed by IEH at the time of his declaration and who, in any event, does not appear to have the technical background sufficient to qualify his purported disbelief as that of an "expert" or "skilled artisan." *See* Allen Decl. Ex. M, Appendix A. Meanwhile, IEH's various accounts of third-party skepticism are little more than self-serving hearsay and entitled to little weight.

5.   None of IEH's Purported Secondary Considerations Tip the Scales of Patentability

Even where evidence commercial success or skepticism is more robust than it is in this case, these sorts of secondary factors will not "tip the scales of patentability" where *Graham*'s primary considerations strongly suggest obviousness. *Graham*, 383 U.S. at 36; *Intercontinental Great Brands LLC v. Kellogg N. Am. Co*., 869 F.3d 1336 (Fed.Cir. 2017)(finding very strong *prima facie* case of obviousness where all elements of the claimed patent were taught by the prior art, and concluding that even "strong evidence" of commercial success, industry praise and copying by the defendant did not overcome the prima facie case); *ClassCo, Inc. v. Apple, Inc*., 838 F. 3d 1214, 1223 (Fed. Cir. 2016) (finding value of secondary considerations "not strong in comparison to the findings and evidence regarding the prior art"). Where, as here, a claimed invention merely combines known elements with no change to their functions towards a predictable result, "even if the combination filled a long-felt want and has enjoyed commercial success, those matters, without invention, will not make patentability." *Sakraida v. Ag Pro, Inc.*, 425 US 273, 278 (1976) (internal quotes omitted).

## V. Conclusion

There is no material dispute as to the content of the prior art, the scope of the Patents, or the level of ordinary skill in the art. Every element of the Claimed Method was indisputably

known in the prior art, and a competent microbiologist would have had no trouble arranging them according to their known functions to achieve a predictable result. IEH's alleged secondary considerations do not establish that its commercialization of these well-known techniques, prompted by market forces, in the food production industry was non-obvious.

Dated: June 5, 2019

JRG Attorneys

By: /s/Scott J. Allen
Scott J. Allen
Christopher W. McElwain
David W. Balch
Attorneys for Primus Group, Inc.